FORDHAM, APPELLANT, *v.* NORTHERN PACIFIC
RAILWAY CO., RESPONDENT.

(No. 1,883.)

(Submitted April 25, 1904.  Decided May 23, 1904.)

*Appeal—Record on Appeal—Bills of Exceptions—Service—
Waiver—Appeal from Judgment—Notice of Intention to
Move for a New Trial—Natural Watercourse—Flood Waters
of a River—Surface Water—Obstruction.*

1.  Objection that the bill of exceptions was not served in the manner provided by Code of Civil Procedure, Section 1831, is waived by the presenting of amendments to the proposed bill.
2.  The fact that the notice of intention to move for a new trial is not in the record is no ground for dismissal of the appeal from the judgment.
3.  Flood waters of a river, which become severed from the main current, or leave it never to return, and spread out over lower ground, become surface water; but if they form a continuous body with the water flowing in the ordinary channel, or if they depart therefrom presently to return, they are to be regarded as still a part of the stream, subject to the law as to obstruction thereof.
4.  Under the common law overflow waters of a stream which still form part of the stream may not be obstructed by a railroad company by a fill along its right of way without openings, so as to injure the property of another.

*Appeal from District Court, Missoula County; Henry C.
Smith, Judge.*

ACTION by Julia Fordham against the Northern Pacific Railway Company.  Judgment for defendant.  Plaintiff appeals. Reversed.

STATEMENT OF THE CASE.

This action was brought by the plaintiff (appellant here) to recover damages alleged to have been caused by the wrongful act of the defendant railway company.  The plaintiff owns certain lands situated along the south bank of the Bitter Root

river.   A portion of these lands are lowlands, and comprise the bottom land of the river at that point.   The defendant railway company owns a right of way across the low or bottom land of the river on the north side directly opposite plaintiff's lands. Its railroad track is constructed on this right of way, and substantially parallel with the river for some distance.   Near the northernmost line of plaintiff's land the river turns to the north, and is crossed by defendant's railroad by means of a bridge. Prior to 1897 there was open trestlework supporting the track for 1,400 feet west from the west pier of the bridge.   From the west end of this trestle was a solid embankment or fill, constructed in 1887, but concerning which no complaint is made.

In 1897 the railway company constructed a solid embankment or fill from the east end of the old fill to a point 285 feet west of the west pier of the bridge.   The subjoined diagram illustrates the relative situations of these objects.

During every spring or early summer, when the snow in the mountains at the headwaters of the Bitter Root river and its tributaries is melting rapidly, the Bitter Root overflows its banks, and spreads over the plaintiff's lands, and over the lowlands across which defendant's right of way extends. The general fall of the country is towards the north, so that prior to 1897 these flood or overflow waters ran off through defendant's trestlework to the north, and some distance below fell into the channel of the river again. Plaintiff contends that by reason of the fill or embankment made in 1897 the flood waters of the river were held back, raised and caused to overflow her land on the opposite side of the river during the annual overflows in 1898 and 1899 to a much greater extent than theretofore, and when the waters receded during these years a new channel of the river was cut wholly on plaintiff's land, wasting and destroying from ten to twenty acres of valuable agricultural land, and causing damage to her in the amount claimed at least.

Upon the conclusion of plaintiff's testimony, which tended to prove the facts herein set forth, the trial court sustained a motion for a nonsuit, and entered judgment for defendant for costs, from which judgment plaintiff appealed.

*Mr. A. L. Duncan,* and *Messrs. Nolan & Loeb,* for Appellant.

Assuming that the waters in question are flood waters and subject to the law governing surface waters, we respectfully submit that the doctrine announced in the case of *Fitzpatrick v. Montgomery,* 20 Mont. 181, is decisive of the question as to the rule that should be recognized in this state.

It is true that a common-law doctrine prevailed regarding surface water to a limited extent, but there was no authority under this common-law rule for the accumulation of surface waters upon one's land to be thrown upon another's to his injury. An inspection of the authorities discussing this particular feature clearly shows this. (*Barkley v. Wilcox,* 86 N. Y. 146; *Gannon v. Hargaden,* 10 Allen, 109; *Bellows v. Sackett,*

15 Barb. 96; *McDaniels* v. *Cummings,* 83 Cal. 515; *Bowlsoy* v. *Speer,* 31 N. J. Law, 351; *Boyd* v. *Conklin,* 54 Mich. 583; *Shane* v. *Kansas City, etc.,* 71 Mo. 245; *Kaufman* v. *Greismier,* 26 Pa. St. 415; *Morrisy* v. *C. B. & Q. Ry. Co.,* 56 N. W. Rep. 953.)

We insist that the waters of the Bitter Root in flowing as they do over the lowland back into the river again and back again to the parent stream do not cease to be the waters of the river, and that whatever the rule may be respecting surface waters, in this case the doctrine finds application that interfering with the waters of a running stream to the injury of another, exposes to liability.    The following authorities sustain the position here contended for:    *O'Connell* v. *East Tenn. Ry. Co.,* 87 Ga. 246; *Curtis* v. *Eastern R. R. Co.,* 98 Mass. 428; *Crawford* v. *Rambo,* 44 Ohio St. 282; *Barden* v. *City of Portage,* 79 Wis. 133; *Speelman* v. *City of Portage,* 41 Wis. 144; *Byrne* v. *Minn. & St. Louis Ry. Co.,* 38 Minn. 233; *Carriger* v. *R. R. Co.,* 7 Lea, 389; *West* v. *Taylor,* 16 Ore. 170; *Mitchell* v. *Bain et al.,* 142 Ind. 614; *Moore* v. *C. B. & Q. Ry. Co.,* 39 N. W. Rep. 390; *Sullins* v. *Chicago, etc. R. R. Co.,* 39 N. W. Rep. 545; *Palmer* v. *Waddell,* 22 Kan. 352.

In the case of *Carland* v. *Aurin,* 53 S. W. Rep. 940, there is a collection of the authorities, and a full discussion of the two rules, giving the states that recognize the one rule as contradistinguished from the other.    (Gould on Waters, Sec. 265; 21 L. R. A. 593; see, likewise, extended note, 85 Am. St. Rep. 716 *et seq.*)    In the note last referred to there is a grouping of the states recognizing the two rules, as well as citation of cases.

If the flood of 1899 was unprecedented, to escape liability, the act of the defendant should in no manner contribute to the injury complained of.    If the embankment were absent the surplus water could readily have escaped towards the north and away from the premises of plaintiff.    (Lawson's Rights, Remedies and Practice, Sec. 1810; *Doster* v. *Brown,* 71 Am. Dec. 153.)    We also refer the court to the following provisions

of the statutes of this state: Civil Code, Secs. 4600, 4605 and 1250.

*Mr. William Wallace, Jr.,* for Respondent.

The common and not the civil law doctrine prevails in Montana. (*Morrisey* v. *Ry., 56 N. W. 953; *Walker* v. *Ry.,* 165 U. S. 593, 41 Co-op. Ed. 837.) In four states, viz., Washington, Missouri, Kansas and South Carolina, having statutes identical with Section 5152, the statute is held to control and to demand that the common-law doctrine be observed. (*Cass* v. *Dix* (Wash.), 44 Pac. 113-14; *Edwards* v. *Ry.* (S. C.), 18 S. E., quoted, 56 N. W. 953, l. ft.; *K. C. Ry.* v. *Riley,* 33 Kan. 374-5-6, 6 Pac. 581, quoted in 165 U. S. 603, 41 Co-op. Ed. 843; *Abbott* v. *Ry.,* 83 Mo. 271, thus quoted in 38 N. W. 547, top.) And California likewise so construes the section from which we took Section 5152, *supra,* though it confesses to having mistakenly taken as the common-law doctrine the rule of the civil law. (*McDaniel* v. *Cummings,* 83 Cal. 515, 23 Pac. 796.)

The common-law doctrine may be stated thus: The high water overflow of rivers, when passed beyond the defined stream channel banks, and spread out on the valley bottom, is surface water, to be fought as a common enemy, and not a watercourse that must be suffered to flow over the land. This is announced in the following states and territories: Washington, Nebraska, New York, Kansas, California, Louisiana, Indiana, Missouri, New Mexico, Connecticut, New Jersey, New Hampshire and Vermont. (*Cass* v. *Dix, supra; Mailhout* v. *Pugh,* 30 La. Ann. 1359, and cases; *Ry.* v. *Keyes* (Kan.), 40 Pac. 275; *Morrisey* v. *Ry., 56 N. W. 946; *Meyer* v. *Ry., 88 N. Y. 355; *Taylor* v. *Fickus,* 64 Ind. 167; *Ry.* v. *Stevens,* 73 Ind. 280; *Abbott* v. *Ry., 83 Mo. 271; *McCormick* v. *Ry., 57 Mo. 438; *Hodge* v. *Ry., 39 Fed. 449-455, r. ft.; *Walker* v. *Ry.,* 165 U. S. 593, listing states; *Gray* v. *McWilliams,* 98 Cal. 157, 32 Pac. 976-8; *McDaniels* v. *Cummings, supra; Lamb* v. *Recl. Dist.,* 73 Cal. 125, 14 Pac. 625.)

None of the depressions—called channels by counsel—constitute watercourses, so as to prevent the application of the common-law doctrine of surface waters. (*K. C. Ry. v. Riley,* 6 Pac. 583.)

Whenever any court, considering this question, distinguishes surface water from a watercourse, they invariably adopt the definition of "watercourse" that has been accepted by this court in many water appropriation cases. And thus tested there can be no pretense of a watercourse outside of the highest banks of the stream channel. (*Morrisey v. Ry.;* 56 N. W. 949-50-2; *Cass v. Dix,* 44 Pac. 113; *Ry. v. Keyes,* 40 Pac. 275-8; *Rowe v. Ry.,* 43 N. W. 77, 1. ft; *Johnson v. Ry.,* 50 N. W. 772; *Lessard v. Stram,* 22 N. W. 285; *Hoyt v. Hudson,* 27 Wis. 660-1.)

An owner improving his land for the purpose of its ordinary use may divert flood water, though without such ownership and improvements he might not do so. (*Morrisey v. Ry.,* 56 N. W. 949, ft. 952 r. m.; *Hodges v. Ry.,* 39 Fed. 450; *Clauson v. Ry.,* 82 N. W. 147-8; Whittaker's Smith on Negl. 95, note cases.)

It is notable that this complaint nowhere alleges interference with any higher overflow channel, nor any defined current overflow. (*O'Connor v. Ry.,* 9 N. W. 287; *Rowe v. Ry.,* 43 N. W. 77; 82 N. W. 148, *supra.*)

There is neither allegation nor proof of negligent construction, and counsel disclaim any such contention in their brief. (56 N. W. 946, *supra;* 40 Pac. 278, *supra.*)

Independent of all else, the familiar doctrine of proximate cause demanded a nonsuit. (16 Ency. Law, 1st Ed., 428-9-30-1-2-3, 446; Whitt. Smith on Negl., 35-6-7, notes, cases; 19 Ency. Law, 1st Ed., 301; Redf. & Sherm. on Negl., 25-6-8, 32.)

This flood of 1898 or 1899 was extraordinary high water and for its ravages defendant, however at fault, could not be held responsible. (*Viterbo v. Friendlandt,* 120 U. S. 732; 57 Am. Dec. 680-682; 13 S. E. 489-493; 56 Pa. St. 445.) The evidence left it absolutely uncertain how much of the damage was done in one year and how much in the other, or how much

was caused by the extraordinary flood, a non-recoverable cause, or how much by the flood, a recoverable cause. Such a condition of the evidence prevents recovery. (*Perkins* v. *Payette,* 68 Minn. 152; 28 Am. Rep. 84; *Patton* v. *Ry.,* 179 U. S. 658; *Grant* v. *R. R.,* 31 N. E. 220-221; *Orth* v. *Ry.,* 47 Minn. 384, 50 N. W. 363; *Swanson* v. *Ry.,* 79 Minn. 398, 82 N. W. 670; *Briggs* v. *Ry.,* 52 Minn. 36, 53 N. W. 1019; *Searles* v. *Ry.,* 101 N. Y. 661, 5 N. E. 66; *Taylor* v. *City,* 105 N. Y. 202, 11 N. E. 642.) To meet this it is suggested that plaintiff would be entitled at least to nominal damages for one year. But the supreme court of this state has expressly decided that they will not reverse a judgment on the mere ground that the plaintiff might have been entitled to nominal damages. (*McCauley* v *McKeig,* 8 Mont. 389, 21 Pac. 22.)

MR. JUSTICE HOLLOWAY, after stating the case, delivered the opinion of the court.

It is conceded that the railway company constructed the fill in 1897 on its own land. It is alleged in the answer that this new fill was necessary to avoid "dangerous and difficult curves and grades and to avoid annoyance to public travel," and this is not denied.

Respondent railway company contends that the bill of exceptions was not served in the manner provided by law; but this obejction is waived by the respondent presenting amendments to the proposed bill of exceptions. The purpose of the statute (Section 1831, Code of Civil Procedure) is to insure that the person upon whom service is sought shall actually receive, if possible, the document to be served; and when a party appears, and presents and has allowed his amendments to a proposed bill of exceptions, he is hardly in a position to say that he has never actually received a copy of the same.

Respondent also contends that the appeal should be dismissed for the reason that the notice of intention to move for a new trial is not in the record. This is untenable, first, for the reason that this is an appeal from a judgment, and not from an order

overruling a motion for a new trial; and, second, respondent's contention is disposed of adversely to it by the decision in *King* v. *Pony Gold Mining Co.,* 28 Mont. 74, 72 Pac. 309.

Respondent also contends that there was an extraordinary flood during 1898 and 1899, and that one Rockramer had placed a dike or embankment along the north bank of the Bitter Root river further west than respondent's new fill, and that this dike was, or may have been, the proximate cause of the damage to plaintiff's land. But neither of these facts appear from the record in this case sufficiently to deserve further consideration. At most there is but a hint of the existence of either.

The only serious question for determination is: Are these flood or overflow waters of the Bitter Root river, which, prior to 1897, flowed off over the lowland now crossed by respondent's new fill, to be treated as a part of a natural watercourse or as surface waters? And this question is to be resolved independently of the question whether the common-law rule or civil-law rule respecting the disposition to be made of these waters after their character is determined prevails in this state.

It must be conceded that, if these overflow waters are to be treated as the other waters of the Bitter Root river when within its banks and the low, bottom land across which defendant's right of way extends as a natural water course during flood times, then defendant had no right to interfere with the natural flow of such waters to the damage of plaintiff, and the court erred in granting a nonsuit.

1. Are these overflow or flood waters of the Bitter Root river to be treated as surface waters or as a part of the natural watercourse? The decisions are in hopeless conflict upon this subject, and no useful purpose can be served by a review of them. Upon the same state of facts different courts have decided the question differently. In Indiana, Missouri, Kansas, Nebraska and Washington it is held that these overflow waters are surface waters, to be dealt with as such according to the rule prevailing in those states. (*Cass* v. *Dicks,* 14 Wash. 75, 44 Pac. 113, 53 Am. St. Rep. 859; *Missouri Pac. Ry. Co.* v.

*Keys,* 55 Kan. 205, 40 Pac. 275, 49 Am. St. Rep. 249; *Mc-Cormick* v. *Ry. Co.,* 57 Mo. 433; *Morrissey* v. *Ry. Co.,* 38 Neb. 406, 56 N. W. 946; *Taylor* v. *Fickas,* 64 Ind. 167, 31 Am. Rep. 114.)

In California, while a distinction is apparently made between overflow waters and surface waters, the common-law rule respecting surface waters is held applicable to overflow or flood waters. (*Gray* v. *McWilliams,* 98 Cal. 157, 32 Pac. 976, 21 L. R. A. 593, 35 Am. St. Rep. 163.)

"By the common law, flood water overflowing the banks of a stream is a part of the stream, though not flowing in a channel, and a riparian owner is not allowed to protect his lands by erecting barriers to the injury of another. This is clearly so in case the flood spreading beyond the banks of the stream forms with the stream one body, and flows within the accustomed boundaries of such floods." (Jones on Easements, Sec. 729; *Rex* v. *Trafford,* 1 B. & Ad. 874; *Trafford* v. *Rex,* 8 Bing. 204.)

In Georgia, Ohio, Iowa, Virginia, Minnesota, South Carolina, Wisconsin and Tennessee it is held that these flood or overflow waters are still a part of the stream, and to be treated as such. (*O'Connell* v. *E. Tenn. etc. Ry. Co.,* 87 Ga. 246, 13 S. E. 489, 13 L. R. A. 394, 27 Am. St. Rep. 246; *Crawford* v. *Rambo,* 44 Ohio St. 279, 7 N. E. 429; *Sullens* v. *C. R. T. & P. R. R. Co.,* 74 Iowa, 659, 38 N. W. 545, 7 Am. St. Rep. 501; *Moore* v. *C. B. & Q. Ry. Co.,* 75 Iowa, 263, 39 N. W. 390; *Burwell* v. *Hobson,* 12 Grat. 322, 65 Am. Dec. 247; *Byrne* v. *M. & St. L. Ry. Co.,* 38 Minn. 212, 36 N. W. 339, 8 Am. St. Rep. 696; *Jones* v. *Seaboard Air Line Ry. Co.,* 67 S. C. 181, 45 S. E. 188; *Spelman* v. *City of Portage,* 41 Wis. 144; *Barden* v. *City of Portage,* 79 Wis. 126, 48 N. W. 210; *Carriger* v. *E. Tenn. etc. Ry. Co.,* 7 Lea, 388.)

While a federal court usually follows the decisions of the highest court of the state in which such federal court is held, especially with reference to questions of local law or practice, the United States Circuit Court for the District of Indiana first decided that this question is one of general law, and then re-

fused absolutely to follow the decisions of the Supreme Court of Indiana respecting this subject. The supreme court, in *Taylor v. Fickas,* above, and subsequently, held that these overflow waters are surface waters; but the federal court, after carefully reviewing these decisions, says: "The waters cast into a stream by ordinary floods must have a channel in which they are accustomed to flow, and, if they have, that channel is a natural watercourse, with which no riparian proprietor can lawfully interfere to the injury of another. If there is a natural water way or course, and its existence is necessary to carry off the water cast into the stream by ordinary floods, that way is the flood channel of the stream; and, if it is the flood channel of the stream, the water which flows there cannot be regarded as surface water. Surface water is that which is diffused over the ground from falling rains or melting snows, and continues to be such until it reaches some bed or channel in which water is accustomed to flow. * * * It must necessarily follow from this general principle that, where water naturally flows, though the volume may change with the varying seasons, there is a natural watercourse, even though at times the place where the water flows in ordinary floods may become entirely dry. It can make no difference that the boundaries within which the water flows change with varying seasons, for the way which nature has provided for its flow is the stream, and water flowing in that waterway is not surface water. * * * With reasonably near approximation to accuracy, it may be laid down as a general rule that all the waters of a river which form one body when flowing within the boundaries within which they have been immemorially accustomed to flow in times of ordinary floods, constitute waters of the river, and are not surface waters." (*Cairo, V. & C. Ry. Co.* v. *Brevoort* (C. C.), 62 Fed. 129, 25 L. R. A. 527.)

The annual overflow of the Bitter Root river is caused by the melting of the snows in the mountains many miles from the land in controversy. The water is collected in the main channel, and carried down, until, by the addition of the waters of

its tributaries, the whole amount exceeds the capacity of the channel in which the waters of the river ordinarily flow when these floods or overflows occur. The source of supply in low water and high water is the same, the only difference being the quantity of water precipitated by that supply. We are of the opinion that great difficulty would be experienced in attempting to distinguish between the river waters proper and the overflow waters, where they form one continuous body, and in attempting to apply a particular rule to one and another rule to the other.

Without attempting to reconcile the diverse decisions, we are of the opinion that the following rule furnishes the safest guide for the determination of a question which has vexed the courts of many of our states as well as those of England, viz.: Whether the water from the overflow of streams is to be considered as still a part of the watercourse, or to be treated as surface water, shall depend upon the configuration of the country, and the relative position of the water after it has gone beyond the usual channel. If the flood water becomes severed from the main current, or leaves the same never to return, and spreads out over the lower ground, it becomes surface water. But if it forms a continuous body with the water flowing in the ordinary channel, or if it departs from such channel presently to return, it is to be regarded as still a part of the stream. (13 Am. & Eng. Ency. Law, 2d Ed., 687.)

Applying the foregoing definition to the facts of this case, we are of the opinion that the waters in question, which were obstructed by defendant's new fill or embankment, were a part of a natural watercourse.

2. Section 5152 of our Political Code provides: "The common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of this state, or of the Codes, is the rule of decision in all the courts of this state." We are unable to find anything in the common-law rule respecting these waters or watercourses repugnant to or inconsistent with the Constitution

of the United States or the Constitution or statutes of Montana, and therefore hold that the common law must be enforced as the rule of decision in this case. This is the construction given by the courts of other states to a statutory provision similar to Section 5152, above. (*Edwards* v. *R. R. Co.,* 39 S. Car. 472, 18 S. E. 58, 39 Am. St. Rep. 746; *Cass* v. *Dicks, supra; McDaniel* v. *Cummings,* 83 Cal. 515, 23 Pac. 795, 8 L. R. A. 575.)

By this we do not mean to say that respondent may not maintain the whole or any part of the fill constructed in 1897. Its right with respect to this is limited by the provision that it shall provide suitable means of escape for the waters of the Bitter Root river at its ordinary flood or high water, so that plaintiff's land shall not, by reason of such fill, be compelled to bear any greater burden of such overflows than it bore prior to 1897. In other words, the railway company's right to maintain this fill is subject to the limitation imposed by the maxim *"Sic utere tuo,"* etc., as liberally translated in our Civil Code, Section 4605: "One must so use his own rights as not to infringe upon the rights of another." (Jones on Easements, 729; *Crawford* v. *Rambo, supra; Sinai* v. *Railway Co.,* 71 Miss. 547, 14 South. 87.)

This is an ancient rule of the common law—not of the civil law, as contended by counsel—and, in our opinion, is particularly applicable to this case. It imposes no undue hardship upon the railway company, for in locating its right of way and in constructing its roadbed the company was bound to take notice of the known habits of the Bitter Root river, and to build with reference to them. If the view contended for by respondent be accepted, the railway company would be at liberty to fill up the remaining trestle west of the bridge, and would only be compelled to leave sufficient room under its bridge to accommodate the waters of the river itself as defined by its banks.

While the position taken by the trial court and by counsel for respondent finds support in the decisions of the highest courts of many of the states, we think the rule herein announced the

better one, and sustained by the decided weight of authority. The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

---

30  433
31  103

